STOCKTON et al. v. WATSON et al.

(Circuit Court of Appeals, Seventh Circuit. May 7, 1900.)

No. 587.

PRINCIPAL AND AGENT—AGENCY CREATED BY COURSE OF DEALING—RIGHTS OF THIRD PERSONS DEALING WITH AGENT.

During some six years, complainants, who resided in New Jersey, made loans of trust funds in Chicago through one A., who took and forwarded to them applications, notes, mortgages, and abstracts of title, and upon whom they relied to examine titles, make valuations, and to disburse the loans, paying off prior liens therefrom when necessary. He also collected interest on such loans, and in some cases the principal, remitting the same to complainants. In the six years, 26 loans, aggregating over $100,000, were so made. During such time defendant applied to A. for a loan for the purpose of paying off an existing incumbrance on his property. He furnished an abstract, and at A.'s request executed a note and trust deed to A., which the latter forwarded to complainants; first indorsing the note without recourse, as was the custom between them. Complainants accepted the loan, and remitted the amount to A., who converted it to his own use; stating to defendant, from time to time, that the money had not been received. After a year, A., at defendant's request, executed a release of the trust deed, which defendant recorded, and procured a loan from other parties, with which he paid off his prior mortgage. For two years A. continued to remit to complainants the interest on the note, representing it as having been collected from defendant. Defendant had no direct dealings with complainants, and had no knowledge for whom A. was acting, or that the note and mortgage, which A. claimed to have mislaid, had ever gone out of his possession. Held that, as between the parties, A. was the agent of complainants, who were bound by his acts, and that they could not enforce the mortgage, for which defendant received no consideration.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This appeal is prosecuted from a decree in favor of the appellees (defendants below) dismissing the bill of foreclosure filed September 12, 1893, against the principal defendant, Watson, and against Bliss and Hanscom, trustees, the active defendants, for want of equity; ordering cancellation of Watson's note for $3,500, together with the trust deed sought to be foreclosed, as without consideration and void, and as a cloud upon the title of Watson's homestead. The bill prayed for the foreclosure of a note and trust deed for $3,500, dated December 21, 1889, due two years after date, payable to the order of Isaac E. Adams, drawing 8 per cent. interest, payable semiannually, payable at such place in Trenton, N. J., as the legal holder might from time to time, in writing, appoint, or, in default of such appointment, then at the office of Isaac E. Adams, in Chicago. The note was indorsed to appellants (complainants below), trus-

tees, without recourse, by Isaac E. Adams, and secured by trust deed to Adams' trustee; Hamilton and Lynch being first and second successors in trust. The bill recited the assignment and transfer of the note by Adams for the consideration of $3,500, and prayed foreclosure for nonpayment of principal, and for alleged failure on Watson's part to keep the premises insured. The bill alleged, also, that Adams, trustee, had released the trust deed without authority, and that it was only within a short time prior to the filing of the bill that complainants had discovered the release. The answers of Watson and Bliss and Hanscom admitted the execution and delivery of the note and trust deed to Adams, but alleged that the same had been left with him under such circumstances that Adams, by such execution and delivery, had acquired no legal or equitable title thereto, nor had complainants subsequently; that the delivery was made to Adams, as the agent of complainants, for the express purpose of effecting a loan wherewith to take up the existing incumbrance in a like amount, then held by the Home Building & Loan Association of Rockford, Ill., on Watson's homestead; that the money had never been paid to Watson, nor had the mortgage been paid off by appellants. In their answers and cross bills, appellees insisted that appellants never purchased the note and trust deed, in the ordinary acceptation of the term; denied that Adams or appellants had ever given to Watson consideration for the note; and insisted that Adams was at the time of the Watson transaction, and for a long time prior to the filing of the bill had been, the agent of appellants in Chicago, and that the note and trust deed were left with Adams, to be forwarded to appellants for inspection and approval by them, and, when inspected and approved, if funds were available, the loan would be completed, and the money paid over to the prior mortgagee in discharge of the mortgage; that Adams, as such sole Chicago agent of appellants, had invested large sums of trust moneys for appellants prior to the event in question, and that his opinion as appellants' agent and attorney, together with his recommendation of the security, was conclusive with appellants as to regularity, title, and value in all loans so made for them; and that Adams had full authority to act for appellants in the submission, preparation, consummation, and discharge of these loans, and was duly authorized to receive the money so sent by appellants, and properly disburse the same. It was also recited that appellants had notice of the existing incumbrance, and the use to which the money was to be put, both through their agent and of record; that the loan made by Bliss and Hanscom paid off the mortgage to the building and loan association, and while the trust deed to Bliss and Hanscom, trustees, was of record until 1893, it had never been questioned until the filing of appellants' memorandum and declaration. The cross bill of Watson prayed that the note and trust deed might be declared void and without consideration, and be canceled, and the trust deed decreed a cloud upon his title. The cross bill of Bliss and Hanscom prayed that theirs might be declared a paramount lien, and for a decree of foreclosure. The master reported in favor of appellees. The court overruled the exceptions filed by appellants, dismissed the bill for want of equity, sustained the cross bills, and decreed the relief asked by Watson, and that asked by Bliss and Hanscom, except that the latter elected not to press the foreclosure of their security; Watson not being in default as to interest, etc.

There is no dispute about the facts of the case, the only disputed questions relating to the proper conclusions to be drawn from the finding of facts by the trustee. These were as follows:

(1) That in the year 1889 the defendant Orson H. Watson was the owner of certain real estate in Cook county, Ill., described as follows: Lot 41 in block 4 in J. R. Wickersham's resubdivision of blocks 5 and 6 in K. K. Jones' subdivision of the N. ½ of the S. W. ¼ of section 23, township 40 N., range 13 E. of the third P. M.; also, lot 22 and the S. ½ of lot 23 in block 8, Cairnduff's addition to Edgewater. And the said lot 22 and S. ½ of lot 23, last mentioned, were subject to a mortgage to the Home Building & Loan Association of Rockford, Ill., to secure a loan of the sum of $3,500, which mortgage was dated October 15, 1888, and duly recorded in said Cook county on November 5, 1888.

(2) That in 1889 said Watson desired to take up the said $3,500 loan, and was introduced to the defendant Isaac E. Adams by a man named Johnson, and stated to Adams the purpose for which he wanted the loan. That said

Adams stated to Watson that he (Adams) was agent for the parties in the East who controlled a large amount of money, and that he thought he could make the loan. That thereupon said Adams called for the abstract of title to Watson's property, and the same was delivered to him by said Watson for examination, and was kept by said Adams for some days, after which time he stated to said Watson that "they" would make the loan; that it was customary to make out the trust deed and notes, and everything; and that he would examine the abstract, and send the papers East for examination. And the master finds that this was in fact in accordance with the wishes and instructions of the complainants to said Adams, and in the course of dealing (i. e. that the money was forwarded by complainants only after examination and approval of such papers as were sent to them); that thereupon said Watson executed the note for $3,500 to the order of said Adams, and the trust deed securing the same to said Adams as trustee, and W. A. Hamilton as successor in trust; said Watson's wife, who has since died, joining in the execution of said trust deed. That said note and trust deed were prepared by said Adams, or in his office, and that at his request an additional piece of real estate (being lot 41, above described) was included in said trust deed, but that said last-named piece of property was subsequently taken back by the person from whom said Watson had purchased it, being subject to a prior incumbrance.

(3) That, shortly before the time when said note and trust deed were executed and delivered to said Adams, said Watson also signed a certain application for loan, which was prepared by said Adams, and by him forwarded to complainants, which provided, among other things, that the cost of all papers, searches, etc., should be at said Watson's expense, and subject to the approval of said Isaac E. Adams. Said application also included an appraisal by C. E. Johnson and C. F. Ames, in which the land was valued at $1,800 and the buildings at $4,700. And that all of the papers named, together with the abstract, were left with said Adams by said Watson; said Adams stating that he would have to hold the abstract for examination, and have it brought down, with the trust deed entered on it.

(4) That at the end of two weeks said Watson called, and said Adams claimed that he had not had time to examine the abstract. That said Watson continued to call from day to day, and that it was several months before said Adams had the abstract examined. That some further time was consumed in correcting a slight flaw in the title. That in the meantime said Adams stated to said Watson that he had sent the note and trust deed East for approval, but did not say to whom he had sent them, or to what place. And that said Watson did not know whom Adams claimed to represent until the early part of the year 1893, as hereinafter stated.

(5) That after the delivery of said papers to Adams, and after the aforesaid defect in the title had been cured, said Watson made frequent calls upon said Adams, and the latter put him off from time to time upon various pretexts—First, that the parties who were to loan the money had not answered him yet; then, that they did not have the money; that they very soon would have it; that they had loans that were due, and some had not been paid; and that as soon as they got the money they would make the loan. These visits by Watson extended over nearly a year, during which said Adams stated one definite time at which the parties would make the loan, and had the Home Building & Loan Association draw on him at his bank, but stated that the money did not come forward, and so he could not pay it, and he did not pay the draft.

(6) That finally said Watson became impatient, and insisted upon having the money at once. That Adams said he would give the papers back, and a release. That he did execute the release, which is in evidence, and returned a part of the papers, including the abstract, but did not return the note or the trust deed. That he stated at the time that there were one or two of the papers mislaid, that he could not put his hands on just then; but he had them somewhere in his office, and he would give them to said Watson when he found them. That said Watson afterwards continued to call from time to time at Adams' office, and telephone him and write him, but said Adams stated that he could not find said trust deed and notes; that they were mislaid, and were of no value anyway.

(7) That said Watson was a bookkeeper employed by Parkhurst & Wilkin-

son, in Chicago, and knew of said Adams only as a lawyer in good standing, and a friend of the senior member of the firm by which he (Watson) was employed; that he had no suspicion, or reason for suspicion, of said Adams' honesty; that he never paid any money to said Adams or to complainants for interest or insurance, and was never called upon by them, or either of them, for any money for any purpose, except in 1893, as hereafter stated, or for the production of tax receipts; and that he never knew or had reason to suspect that the complainants held his note and trust deed until on or about May 17, 1893, when he received from complainants' attorneys in Chicago a letter demanding payment of said note.

(8) That at the time of executing said release said Adams stated to Watson that he had complete authority to transact all his principal's business, execute releases, and everything.

(9) That said Watson, for the purpose of taking up the building and loan association mortgage above mentioned, made a written application, which appears in the evidence, dated October 20, 1890, to the defendants Bliss and Hanscom, for a loan of $3,400, which was accepted, and afterwards, and on the 8th day of November, 1890, said Watson and his wife executed and delivered to said Bliss and Hanscom the note for $3,400, and the trust deed securing the same, upon the said Edgewater property, both of which appear in the evidence herein. That Watson informed Bliss and Hanscom. through their lawyer, that he had attempted to get the money through Adams, but his parties could not make the loan. That said trust deed was duly recorded in said Cook county on the 13th day of November, 1890, and on the same day said Bliss and Hanscom paid to said Home Building & Loan Association of Rockford, Ill., the sum of $3,346.60 upon their draft for that amount. and thereupon, also on the same day, said Home Building & Loan Association executed and delivered to said Watson and wife a release of their said mortgage dated October 15, 1888, on said Edgewater property, which release was duly recorded in said Cook county November 24, 1890.

(10) The master further finds that no part of the principal of said Bliss and Hanscom note has been paid, and that the same is overdue and unpaid in whole or in part, together with interest thereon from and after May 8, 1896, according to the terms of said note.

(11) The master further finds from the evidence that the $3,500 note of Watson, and the trust deed securing same, were forwarded by Adams to the complainants, Stockton and Anderson, on or about January 11, 1890. That they were duly received by complainants, and they thereupon forwarded the sum of $3,500 to said Isaac E. Adams by a draft for that amount on the Union National Bank of Chicago, dated January 15, 1890, signed by both of said complainants, as trustees, and payable to the order of said Adams. That, in the same letter in which said Adams inclosed said note and trust deed, he stated he would send opinion the next week. A letterpress copy of an opinion on the Watson title was introduced in evidence from the books of the firm of Adams & Hamilton, of which said Adams was the senior partner, but there was no satisfactory evidence introduced that it ever came into possession of complainants. Said opinion was dated January 10, 1890, and was signed with the firm name in Adams' handwriting, but it was a false opinion, in that it made no mention of the existing mortgage to the Home Building & Loan Association, and falsely stated that the title to the Edgewater property was in said Watson in fee simple, subject only to the trust deed to Adams, dated December 21, 1889, securing said $3,500 note.

(12) The master further finds from the evidence that the complainants were not aware of the existence of said prior mortgage until the early part of the year 1893, and consequently finds it to be the fact either that they did not receive the abstract of title to the Watson property, or else that, if they did receive it, they did not make a careful examination of said abstract, and that, if they had made a careful examination of said abstract, they would have discovered the existence of such prior mortgage, and that it did not appear to have been released.

(13) The master finds that the $3,500 which was sent by complainants to Isaac E. Adams by draft dated January 15, 1890, was received by said Adams and appropriated by him, and that he never turned over any portion thereof

to said Watson, but, on the contrary, stated to said Watson that he (Adams) had not received said money; that, after so appropriating said $3,500, said Isaac E. Adams himself paid to the complainants the semiannual installments of interest upon Watson's note for that amount which they held, representing to complainants that he (said Adams) was collecting such interest from said Watson; that such interest payments were made by said Adams semiannually until on or about February 24, 1893, at which time the said Watson note was more than 14 months overdue, and said Adams also kept said premises insured.

(14) The master further finds that the complainants never had any direct dealings or communication with said Watson concerning said loan or proposed loan; that all the business relating thereto was transacted by them through said Adams; that they made no demand upon said Watson for payment of said note, nor did they communicate with him in any way regarding the same until May 16, 1893; that said complainants shortly before that time discovered that said Watson trust deed had been released by said Adams, and they thereupon, on April 24, 1893, filed for record in said Cook county the memorandum and declaration which is in evidence herein,—stating, among other things, that said release was made without authority, and that they claimed that said trust deed was still a valid lien upon the premises therein described.

(15) As to the character of the business relations between the complainants and said Isaac E. Adams, the complainants testified in their depositions taken in Trenton, N. J., and the witness W. A. Hamilton, who is a defendant herein, testified before the master. There was also introduced a great mass of correspondence between the complainants and said Adams, most of which was objected to; but as complainants had testified that their relations with said Adams were only of a very restricted character, and had introduced a copy of one of their own letters in corroboration of such testimony, the master considered it proper to admit as much of such correspondence as either of the parties regarded as material, in order that the entire facts as to such business relations might appear. The master finds from the evidence that the defendants Isaac E. Adams and W. A. Hamilton formed a partnership for the practice of the law on January 1, 1888, which continued until the 1st of December, 1892, but that prior to said partnership, and from November 1, 1886, said Adams and Hamilton had been together, and sustaining relations almost those of co-partners.

(16) The master finds that the relations between said Adams and the complainants began in the fall of 1886, and continued without intermission until about April, 1893; that such relations were with Adams personally, and not with his firm, although the legal work required was performed by said firm, and by them charged to the respective borrowers; that the complainants were trustees of an estate, and had large sums of money to loan, and, desiring to make loans on property in the city of Chicago, they made arrangements for that purpose with said Isaac E. Adams; that all of the correspondence relating to the complainants' affairs in Chicago was carried on with and by Adams, excepting in a few instances when he was absent from the city or was ill; that all applications for loans were presented to the complainants by Adams; that all moneys sent by complainants to be loaned in Chicago were sent to said Adams; that those moneys were all disbursed by said Adams, excepting in one or two instances when he was absent from the city; that all collections of principal and interest due on complainants' loans in Chicago were made by said Adams, with a very few exceptions, and all matters of renewals of loans, insurance, and the payment of taxes were attended to by said Adams, and that as to all questions of title, values of securities, form and preparation of papers, removal of existing liens, and in fact all the details arising in connection with the loaning of money upon real-estate security, the complainants relied almost in every instance wholly and solely upon the judgment and advice of said Adams; that in some instances they required valuation by appraisers, but intrusted the selection of such appraisers to said Adams; and that this continued during a period of more than six years, extending from the latter part of 1886 to the early part of 1893.

(17) That during said period said Adams made 26 loans for the complainants, aggregating upward of $110,000; that he collected and remitted to them large sums from time to time, and that as a usual thing when making loans he sent the securities, abstract, and opinion of title to the complainants before receiving the money for them, but in some instances the money was sent to him by complainants when they had received only a portion of the usual papers; that in making collections the usual course was for said Adams to forward the money to complainants before receiving the notes or interest coupons from them, but that in some instances the notes, coupons, etc., were sent by express or by mail to said Adams for collection before complainants had received the money, and that in several letters they expressed a willingness to send others of such coupons to said Adams in advance of collection; that in seven instances principal notes were intrusted by complainants to said Adams for collection, and in two instances for renewal, and that during the entire correspondence between them complainants had no letter books, and kept no copies of any of their letters to Adams, excepting one letter, dated December 24, 1886, which was the first letter in which they definitely accepted any Chicago loans, and is marked "Compl'ts' Exhibit C."

(18) The master further finds that said Adams represented the complainants as their attorney in two lawsuits to which they were made parties, and that this was known to the complainants, and that they referred to said Adams as their attorney in one or more of their letters.

(19) The master further finds: That in the fall of the year 1888 one Charles D. Seeberger called in person upon the complainants, at Trenton, N. J., and stated to them that said Isaac E. Adams had, in connection with the complainants' business, misappropriated two notes, for $3,500 each, in which said Seeberger was interested as half owner; that said Adams had canceled a certain trust deed securing a note for $7,000 belonging to complainants, and had, without said Seeberger's knowledge or consent, substituted therefor said two $3,500 notes. That it was then made known to said complainants that said Adams, after releasing said $7,000 trust deed, had left the complainants without any security for said $7,000 for about five months, extending from September, 1887, to February, 1888. That said Seeberger also then called complainants' attention to a certain alleged misrepresentation in one of said Adams' letters relating to a loan to one Ryan, which consisted in a statement that the money borrowed was to be used in improving the property, whereas in fact it was already improved. That said Seeberger also then informed complainants of certain alleged misdoings of said Adams in connection with a certain building loan made by complainants to one O'Connor, where said Adams was accused of withholding funds from the borrower unjustly, and after the building had been completed. That said Seeberger then informed said complainants of two other matters in which said Adams was alleged to have been guilty of crooked and dishonest work, and to have embezzled large sums of money. That said Seeberger then stated to complainant Stockton that he would be very glad to have him make a personal investigation in Chicago. That said complainant Stockton thereupon expressed his surprise, and stated that he thought there must be some explanation; that he did not know why Adams should rob his friends at home, rather than rob him (Stockton), when he had so much better opportunity to.

(20) The master further finds that in October, 1890, said Seeberger presented to the complainants documentary proof that said Adams had released said $7,000 trust deed (being the Bagley loan) on September 30, 1887; also, that at about the same time said Adams had, in consideration of such release, received a conveyance from said Bagley of a one-half interest in the property so released; and that said complainants were then informed that by such transaction said Adams had made a profit of about $3,000; that they were then also informed of the fact that Adams had falsely represented to them that the land on which said two substituted notes, of $3,500 each, were secured, was worth $30,000, whereas in fact (so it was stated to them) said land had just been purchased for about $12,500.

(21) The master further finds that said complainants made no personal in-

vestigation as to said matters of which they were informed by or through said Seeberger, but that said Stockton requested a friend who was going to Chicago to look into the question of value of the property, and talk to the owners, where he could reach them easily, and see if Adams had been doing anything that he (Stockton) might not approve of; that he gave to said friend a list of some or all of his Chicago loans, probably including Watson's, and that this was some time after said Stockton had the Seeberger story in full; that said friend's report was verbal, and probably through another man, and made no mention of his having seen said Watson.

(22) The master further finds that, in the case of all loans made by them through said Adams, the complainants invariably required that the securities should be in their hands, in Trenton, before they would advance the amount of such loan, and that it was in accordance with their rule and requirement in that regard that said Watson's note and trust deed were forwarded to them in advance of the payment of any of the money by them.

(23) The master further finds that, in their letters relating to a proposed settlement with Adams, the complainants accused him of having collected over $1,000 of interest, and failed to account to them therefor, and evidenced the intention of holding said Adams responsible for the payment to them of such amount, but that this was long subsequent to the making of the Watson loan, and after complainants had discovered that the Watson trust deed had been released.

(24) The master further finds that both of the complainants are lawyers by profession, and that both of them have had large experience in the loaning of money and handling of trust funds, and had had such experience prior to their entering into any relations with Isaac E. Adams.

Upon the coming in of the master's report, and various objections being made to it by the complainants, the master made additional findings of fact as follows:

(1) That the mortgage to the Home Building & Loan Association of Rockford bore date October 15, 1888, and was given by the defendant Orson H. Watson, and Lelia A., his wife, to secure an obligation of the said Orson H. Watson, individually, to pay the said association, in monthly installments, $17.50 on his stock subscription of $3,500; $23.33½ interest, at the rate of 8 per cent. per annum; and $5.83⅓ monthly premiums.

(2) That in the months of November and December, 1886, the defendant Isaac E. Adams wrote the complainant Stockton several letters, soliciting the opportunity of placing loans in Chicago for complainants; and on December 20, 1886, he wrote Stockton, submitting several applications for loans.

(3) That both the complainants testified that neither of them, nor any one on their behalf, had ever employed or authorized the said Adams to act as their agent in the matters in controversy in this suit, or ever paid or agreed to pay him anything by way of commission or compensation for any services relating to the said matters. But both the complainants testified that they had never authorized Adams to release the trust deed sought to be foreclosed in this suit, and did not learn until April 1, 1893, that any deed purporting to release the same had been put on record.

(4) That in December, 1889, the firm of A. F. Seeberger, who were indebted to the complainants for a certain loan, known as the "Ryan Loan," which they had obtained from the complainants through Isaac E. Adams, declined to deal with said Adams in relation to the payment of their loan; and thereupon complainants forwarded their securities to the Union National Bank of Chicago for collection, and the loan was paid to the said bank as the agent of the complainants.

(5) That the defendant Watson never made any inquiry as to who were the persons whom Adams claimed to represent.

(6) That the only object of Charles D. Seeberger's visit to the complainants in Trenton during the fall of 1888 was to give the complainant Stockton full notice of whom and what Adams was, that he might bring pressure to bear upon Adams to compel him to take back certain securities held by complainants, and known as. the "Hawkin's Paper," in which Seeberger claimed a half or a third interest, so that he (Seeberger) could recover it. That he did not state to Mr. Stockton that it was his purpose to compel Adams to make

restitution, but that he explained to Mr. Stockton the purpose of his visit was to get additional facts concerning what he termed the "misappropriation" of the securities in which he was interested.

(7) That said Seeberger wrote the complainant Stockton on August 17, 1888, that Adams had been his most intimate friend, and that the said notes were left in Adams' keeping. That Seeberger subsequently stated to the complainant Stockton that Adams had the said notes to sell, but had no authority to substitute them on his own transactions, and he then charged Adams with stealing the said notes.

(8) That Stockton testified, as to the stories told him by Seeberger, that there were two sides to them, and he heard them both; that there were other facts in connection with Mr. Seeberger's matters which made it very doubtful in his mind what was the true view to take.

(9) That, in all loans made by the complainants through Adams, the expenses of making the loans, of abstracts, and of recording, and the commissions and charges for examining the title, were charged to the borrowers.

(10) That, in the release deed offered by the defendants as releasing the trust deed belonging to the complainants, two alterations appear to have been made before it was recorded. The month of the date was originally "December"; the word being written in the handwriting of Isaac E. Adams, as is the rest of the deed, except the signature to the certificate of acknowledgment. Over the word "December" in the date of the deed is written in another hand (whose, it does not appear) the word "November." The month of the date of the certificate of acknowledgment was also originally "December," in Adams' handwriting, but has been changed to "October," written in a different hand,—whose, it does not appear.

(11) That the record of the pretended release of complainants' trust deed in the recorder's office of Cook county, Ill., does not, by its terms, refer to the complainants' trust deed, but purports to release to Orson H. Watson a trust deed bearing date December 21, 1887, but in the original release (trust deed) the date is December 21, 1889.

(12) That Adams never had possession of Watson's principal note and trust deed from the time he forwarded them to complainants, but they always remained in the possession of the latter.

(13) That, after the information imparted by Seeberger had been received by complainants, they sent no more principal or interest notes to Adams, prior to the date of the trust deed sought to be foreclosed in the original bill in this cause.

(14) That the complainants never intrusted any of their principal notes to Adams prior to the date of the trust deed sought to be foreclosed by the original bill in this case, except the Bagley note, which was sent to the said Adams for collection on or about September 21, 1887, with a letter of instructions as to making the release, signed by both the complainants as trustees.

Among other conclusions from the facts, the master found:

(1) That the complainants were guilty of negligence in paying the $3,500 to Adams upon the receipt of the note and trust deed, without exercising reasonable care to assure themselves as to the condition of Watson's title. Either— First, they did not insist upon the delivery to them of the abstract of title; or, secondly, they received it, and failed to examine the state of the title as shown by it; or, thirdly, if they did receive it and examine it, they failed to discover matters there appearing which were sufficient to arouse suspicion and put any reasonable man upon inquiry, and that inquiry, if prosecuted, must inevitably have resulted in the discovery of the true state of facts. That it is uncertain from the evidence whether the complainants received the opinion of title or not. If not, there would seem to be additional negligence on their part. If, on the other hand, they received both abstract and opinion, the most cursory examination of the two would have shown the falsity of opinion, which would have induced even a careless man to make an investigation into the facts. That the principle applicable to the case is the one stated in the recent case of Breyfogle v. Walsh (C. C.) 71 Fed. 898, as follows: "Situations often arise where one of two innocent persons must suffer from the wrongs of a third, and where the courts, through compulsion, are obliged to impose a hardship upon one to save a loss to the other. The maxim decisive of such cases is that

101 F.—32

the loss must fall upon the one who comes the nearer to responsibility for the wrong of the offender."

(2) That, under the undisputed facts and testimony, Adams, in making the loan, transmitting the securities, and in receiving from the complainants the money, was acting as the agent of the complainants. That the receipt of securities by Adams in accordance with complainants' instructions and demands was, in law, their receipt of such securities, and that the payment in money to Adams, or by him, was the same as payment to or by the complainants. That the long-continued course of dealing with Adams by complainants; their repeated intrusting him with money and valuable securities; their reliance upon his opinion as to values of property and as to title; their intrusting to him the clearing off of prior liens, and their protection from mechanic's liens; and, finally, their evident intention to hold him responsible for interest collected and not paid to them,—all tend to corroborate defendants' claim that Adams was complainants' agent, and that complainants regarded and treated him as such. The master's findings of fact and conclusions of law were confirmed by the court, and the complainants' bill dismissed for want of equity.

Azel F. Hatch, for appellants.
Frederick S. Baker, for appellees.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge (after stating the facts as above). There is practically no dispute about the facts in this case. The findings of the master are fully sustained by the testimony in the case, and were properly confirmed by the court. The full statement of the facts as above in the language of the master's report is equivalent to a decision of the case in favor of the appellees. We fully concur with the conclusions of the master in regard to the superior negligence of the appellants in being the occasion of the loss, and in Adams being the agent of the appellants in making the loan, and in receiving the money which should have been paid to Watson, or applied in payment of the prior incumbrance upon the homestead, but which was embezzled by Adams. There can be no question, from the testimony or from the findings of fact, that Isaac E. Adams, who pocketed the money sent by complainants, and intended for Watson, or to pay off the prior incumbrance, was, all the way through, acting as complainants' trusted agent, not merely for the purpose of submitting applications for loans, but for all purposes connected with the making of the loan, the examination of title, the making of abstracts, the transmission of papers and securities, and the receipt of the consideration. The fact that the note ran to Adams, and was indorsed by him to complainants without recourse, cuts no figure in the case. It is a very common way of doing such business. And the evidence all the way through shows that the loans made by Adams, amounting to some 26 in number, and $110,000 in amount, of which this loan to Watson was but a small part, running through $6\frac{1}{2}$ years of time, from the fall of 1886 to the spring of 1893, were conducted in the same manner in which such loans have been usually made in the West by capitalists residing in the East. They have their trusted agents, through whom applications are made and transmitted; who examine titles, and submit abstracts to be passed upon by the principals; who draw up the papers and securities for the perfection

of the loan, and present them to the lenders, to be approved by them, and to whom the money is at last sent when everything is ready to perfect the loan. Adams properly represented himself to Watson as being the agent of the parties residing in the East who were to furnish the money and make the loan. Watson did not know their names or where they lived. When this loan was applied for, Adams had been acting for the appellants in that same capacity since the fall of 1886,—some three years. During that time he had made loans, examined titles, procured abstracts, drawn up securities, collected and reinvested large sums of money, and had money sent to him by complainants. There was no intimation on the part of Adams that he was acting as agent for Watson, or otherwise than as agent for appellants, in the East. If he had been agent for Watson, there would have been some provision for payment for his services. How he was to be paid, does not appear. Perhaps his own thefts were considered sufficient compensation. At any rate, he seems to have been the only one that got anything out of this and some other loans. He could well afford to keep up a pretense of collecting interest from Watson and transmitting it to his principals, as though Watson had paid through several years, while Watson was constantly urging him to complete the loan, so long as he had the $3,500 in his pocket. The payment of the interest served to postpone the day of the discovery of his defalcation, and which, in turn, enabled him to embezzle other moneys. It served for a time to put off the day of reckoning with his employers. And the evidence shows that it had the effect to put it off much longer than it should, or would if complainants had not been blindly negligent of his misdoings long after they had had good and sufficient warnings. It seems that the original contention on the part of complainants was that Adams was a mere broker, whose entire relation to them ended with his submission of applications, and that they were merely purchasers of the note and mortgage from Adams before maturity. Upon the testimony being taken, this position was abandoned, and it was admitted that the loan was made by them to Watson through Adams, but that Adams was acting as agent for Watson, and that payment to Adams was payment to Watson. In the judgment of the court, this claim is quite as untenable as the other. It appears quite clearly that, for three years before this loan was made, Adams had been acting as the agent of appellants in placing money, during which time he had prepared and submitted applications, prepared the securities, examined titles, and had received all moneys advanced upon these loans, and disbursed the same in such a way that theirs should be a first lien upon the mortgaged premises, and that in transmitting moneys, and reinvesting the same in new loans, Adams had been the sole medium and agency of appellants in Chicago, and this relation continued for several years after this loan was made. All this appears from the findings of the master, and from appellants' own testimony on the hearing, so that the claim that Adams was their agent only for the purpose of submitting applications has but little support in the testimony. We find no error in the record, but think the decree of the court was right, and must be affirmed.